## RAILWAY LABOR EXECUTIVES' ASSN. v. GIBBONS, TRUSTEE, ET AL.

No. A–1135.  Decided June 28, 1980

MR. JUSTICE STEVENS, Circuit Justice.

Proceedings to reorganize the Chicago, Rock Island and Pacific Railroad (the Rock Island) pursuant to § 77 of the Bankruptcy Act, 11 U. S. C. § 205, have been pending before Judge McGarr in the United States District Court for the Northern District of Illinois for over five years.  Because the Rock Island had been sustaining continuing substantial losses, on January 25, 1980, Judge McGarr ordered the Trustee to prepare and file a preliminary plan of liquidation.  On May 27, 1980, the Interstate Commerce Commission filed an advisory report with the District Court concluding "that abandonment of the Rock Island and its dissolution as an operating railroad is required by the public convenience and necessity."  Consistent with its own precedents, the Commission apparently did not recommend that any special labor protection condition be imposed on the Rock Island in

1301

connection with the abandonment. On June 2, 1980, after receiving briefs and hearing argument, Judge McGarr entered an order authorizing complete abandonment of all Rock Island operations and expressly holding that "no labor protection arrangements may be imposed on the Rock Island estate."

Two days earlier, however, the President had signed Public Law 96–254, 94 Stat. 399, 45 U. S. C. § 1001 *et seq.* (1976 ed., Supp. IV), entitled the Rock Island Railroad Transition and Employee Assistance Act (Act). Section 106 (a) of the Act required the Trustee, within 10 days, to enter into an agreement with the collective-bargaining representatives of Rock Island employees and former employees to provide for labor protection payments to terminated employees. Section 106 (b) authorized the Interstate Commerce Commission to impose a labor protection arrangement on the estate if the Trustee failed to reach agreement with the unions. Section 110 of the Act authorized the Trustee to borrow up to $75 million from the United States to provide the funds for payments pursuant to that arrangement. It further provides that such borrowing, as well as the employee protection claims themselves, should be treated as an expense of administration. It is my understanding that, effectively, the employee protection payments and any concomitant obligations of repayment to the United States are thus given priority over the claims of the general creditors on the assets of the estate. The Act further provides that no court may stay the payment of any labor protection benefits. And finally, § 110 (e) provides: "Except in connection with obligations guaranteed under this section, the United States shall incur no liability in connection with any employee protection agreement or arrangement entered into under § 106 of this Title." [1]

---

[1] An explanation of the Act is found in the Senate proceedings. See remarks of Senator Kassebaum of Kansas, 126 Cong. Rec. 4869–4870

Within the 10-day period, the Trustee applied for a pre-liminary injunction against implementation of the labor pro-tection arrangement provisions of the Act on the ground that

(1980). In substance, it appears that the Senator was particularly concerned with preserving the possibility of selling a portion of the Rock Island, known as the Tucumcari Line from Kansas City to New Mexico, to the Southern Pacific Railroad. She explained that the bill extended "directed service" of the Rock Island, which as I understand it, means service ordered by the Federal Government with any losses incurred underwritten by the Federal Government. She indicated that in February representatives of the labor unions and the acquiring railroads had worked out labor agreements adequate to protect employees who would be re-employed by the acquiring roads, but that there was a substantial risk that no protection would be made available to terminated employees who would not be re-employed, and that the smooth transfer might be interrupted by a broad strike called to obtain compensation for the employees who lost their jobs. It was in order to avoid this prospect that the bill was apparently designed to compel the estate to make adequate termination payments that it was not already obligated to make to those terminated employees. It also appears that the original plan was to fund $50 million for those employees, $30 million of which would be secured by the Government as a high priority administration expense, the other $20 million being subordinated to the claims of all other creditors. The total loan was changed to $75 million prior to passage, and, more significantly, all of the loan was to be given the high priority of an administration expense. Thus, Congress rather clearly indicated its intent that the Government ultimately not be required to underwrite any of the employee protection payments, but rather to have them imposed entirely as a burden on the Rock Island estate.

See also the remarks of Congressman Madigan, 126 Cong. Rec. 7096 (1980), in support of H. R. 6837, which included two titles, the first containing provisions for the completion of the northeast corridor. Title II, which became the Rock Island Railroad Transition and Employee Assistance Act, seemed primarily intended to authorize so-called "directed service" to be funded by the Federal Government, but it also included the employee protection program. With respect to the latter, Congressman Madigan stated, in part:

"There is a $75 million guaranteed obligation in this bill for labor protection payments to the Rock Island employees whose jobs are terminated. That is not an appropriation of Federal funds that will not be returned; it is a priority claim against the estate of the Rock Island Railroad, and

the statute authorized an unconstitutional taking of the property of the estate. Judge McGarr granted that relief, concluding that (1) the procedural provisions of the Act required him to take action immediately in order to preserve the estate from irreparable damage, (2) there were no pre-existing contractual or statutory obligations to make labor protection payments that were being quantified by the Act, and (3) the Act would serve neither a public purpose nor the interest of the estate in view of the total abandonment of the Rock Island's operations that had been authorized. He also implicitly concluded that the statutory program could not be justified as necessary to facilitate sales by the Trustee of portions of the railroad's operating properties.

On June 21, 1980, applicant Railway Labor Executives' Association applied to me in my capacity as Circuit Justice for a stay of Judge McGarr's preliminary injunction.[2] Four days later, on June 25, 1980, the United States filed a memorandum supporting that stay application. The applicant contends that the estate will not suffer irreparable damage by simply permitting the negotiation of a labor protection plan to commence. It argues that even if payments pursuant to such a plan would result in an unconstitutional taking of the estate's property, the estate might still be able to convince Judge McGarr that the statutory prohibition against court orders prohibiting payments pursuant to such arrangement is

---

it is structured exactly the same as the Milwaukee bill which we passed late last year.

. . . . .

"At the risk of being redundant, I would like to repeat, the $750 million for the Northeast corridor is in the President's budget. *The money for the Rock Island Railroad will be paid back from the estate of the Rock Island Railroad.*" *Ibid.* (Emphasis added.)

It is worth noting that the "Milwaukee bill" concerned a genuine railroad reorganization, not a liquidation.

[2] Appeal lies to this Court under 28 U. S. C. § 1252, since Judge McGarr held an Act of Congress unconstitutional.

unconstitutional, and that it would be better to enjoin such payments rather than the negotiation of the underlying plan. Alternatively, it is argued that a remedy against the Government to make the estate whole may ultimately be available in the Court of Claims under the Tucker Act if it turns out that any payments made were unconstitutionally required.

Like Judge McGarr, I do not find persuasive any of the suggestions that the Act could not cause the estate irreparable harm. And while the Solicitor General suggests that a Tucker Act remedy *may* exist in the event of an unconstitutional taking, see Memorandum for United States 5–6, it is obvious that his suggestion is equivocal. Moreover, having read the parties' submissions, I am now of the opinion that Judge McGarr was probably correct in concluding that the Act authorizes an unconstitutional taking of property of the estate. It appears to direct a transfer of $75 million off the top of the estate's assets to the employees. While such a transfer might be permissible in the course of a genuine reorganization, at least as of this moment, I have difficulty perceiving how, in the context of a liquidation, this is anything other than a simple taking of the property of the general creditors, as the Trustee argues.

Accordingly, since there is a strong possibility that a stay would set in motion a chain of events that would lead to substantial payments that would be unconstitutional and unrecoverable, I believe that a sufficient showing of irreparable damage has been made to support the entry of the preliminary injunction. Necessarily, my views are tentative, based as they are on the relatively brief submissions of the parties. Nonetheless, for the foregoing reasons, I have decided to deny the application for a stay.