**WISCONSIN CENTRAL LIMITED, an Illinois corporation, Fox Valley & Western Limited, an Illinois corporation, Union Pacific Railroad Company, a Utah corporation, Soo Line Railroad Company d/b/a CP Rail System, a Minnesota corporation, and Duluth, Winnipeg & Pacific Railroad d/b/a CN North America, a Minnesota corporation, Plaintiffs–Appellants,**

v.

**PUBLIC SERVICE COMMISSION OF WISCONSIN, a Wisconsin administrative agency, Cheryl L. Parrino, Scott A. Neitzel, and Daniel J. Eastman, Defendants–Appellees.**

No. 96–1759.

United States Court of Appeals,
Seventh Circuit.

Argued June 5, 1996.

Decided Sept. 13, 1996.

James A. Fletcher (argued), James D. Helenhouse, Oppenheimer, Wolff & Donnelly, Chicago, IL, for Wisconsin Cent. Ltd., Fox Valley & Western Ltd., Union Pacific R. Co., Soo Line R. Co., Duluth, Winnipeg & Pacific Ry. Co.

Steven Levine (argued), Steven M. Schur, Public Service Com'n of Wisconsin, Madison, WI, for Public Service Com'n, Cheryl L. Parrino, Scott A. Neitzel, Daniel J. Eastman.

William P. Croke, Quale, Feldbruegge, Calvelli, Thom & Croke, Milwaukee, WI, for Wisconsin Utilities Ass'n, Inc., Amicus Curiae.

Before COFFEY, MANION, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

The plaintiffs, railroads doing business in the State of Wisconsin, filed this lawsuit in response to rules promulgated by the Public Service Commission of Wisconsin ("PSC"), which has jurisdiction "to supervise and regulate every public utility" in Wisconsin. WIS. STAT. § 196.02(1). The railroads sought declaratory and injunctive relief based upon their assertions that the rules run afoul of several provisions of the Constitution of the United States and that PSC exceeded the scope of the authority delegated to it by the Wisconsin legislature. The district court denied the request for an injunction, and the railroads now appeal pursuant to 28 U.S.C. § 1292(a)(1).

I

In 1992, the Wisconsin Court of Appeals decided a case between Wisconsin Central, Ltd., and PSC concerning Wisconsin Southern Gas Company's placement of natural gas transmission facilities at several locations

through Wisconsin Central's right-of-way. *Wisconsin Central, Ltd. v. Public Service Comm'n*, 170 Wis.2d 558, 490 N.W.2d 27 (1992). In the wake of that lawsuit, several disputes erupted between Wisconsin utility companies and railroads regarding the placement of utility transmission facilities on or across railroad right-of-ways. Motivated in part by these simmering conflicts between utilities and railroads, an organization known as Municipal Electric Utilities of Wisconsin petitioned PSC on May 18, 1994, to adopt rules regarding the compensation and conditions required for utilities to place transmission facilities in or across railroad right-of-ways.

PSC issued a notice of hearing and proposed rulemaking to create chapter PSC 132 of the Wisconsin Administrative Code, "relating to compensation and conditions for the placement of utility facilities in [a] railroad right-of-way." The notice stated that PSC was empowered to issue the rules pursuant to the authority vested in it by the Wisconsin legislature. See Wis.Stat. §§ 196.04(4), 227.11(2)(a), (c).[1] Following the comment period, PSC issued its order adopting the proposed rules on November 9; 1995. This order states that the rules accomplish, among other things, the following:

3. Unless otherwise agreed to by the parties, or unless the railroad can show special circumstances, set compensa-

tion to be paid by a utility placing facilities within a railroad right-of-way at $500, whether the facilities are on public or private property. This compensation is a one-time payment.

4. State that the one-time payment compensates a railroad for direct expenses incurred as a result of the facilities construction, including inspection, administration, flagging, marking, and other direct expenses and, in the case of a private crossing, also compensates the railroad for the placement of the facilities in the right-of-way.

5. Precludes a railroad from requiring a gas utility to encase underground steel gas facilities. However, gas public utilities are required to meet all state and federal safety regulations, including any concerning casing.

Order of the Public Service Commission Adopting Rules, Docket No. 1–AC–153 (Nov. 9, 1995).

The rules were codified at chapter PSC 132 of the Wisconsin Administrative Code. Several provisions of those rules are pertinent to this appeal:

PSC 132.01 Purpose.... (2) These rules shall be applicable to all future facilities and, except as provided in s. PSC 132.03(1), shall be applicable to all existing facilities if agreements concerning existing

---

1. The relevant statutes provide the PSC with subject matter and rule-making authority. Section 196.04(4) addresses the former:

If the parties cannot agree and the commission finds that public convenience and necessity or the rendition of reasonably adequate service to the public requires that a public utility or telecommunications provider be permitted to extend its lines on, over or under the right-of-way of any railroad, or requires that the tracks of any railroad be extended on, over or under the right-of-way of any public utility or telecommunications provider, the commission may order the extension by the public utility, telecommunications provider or railroad on, over or under the right-of-way of the other if it will not materially impair the ability of the railroad, telecommunications provider or public utility, on, over or under whose right-of-way the extension would be made, to serve the public. The commission shall prescribe lawful conditions and compensation which the commission deems equitable and reasonable in light of all the circumstances.

Wis.Stat. § 196.04(4) (Supp.1995). And section 227.11(2) confers rule-making authority as follows:

(a) Each agency may promulgate rules interpreting the provisions of any statute enforced or administered by it, if the agency considers it necessary to effectuate the purpose of the statute, but a rule is not valid if it exceeds the bounds of correct interpretation.

. . .

(c) Each agency authorized to exercise discretion in deciding individual cases may formalize the general policies evolving from its decisions by promulgating the policies as rules which the agency shall follow until they are amended or repealed. A rule promulgated in accordance with this paragraph is valid only to the extent that the agency has discretion to base an individual decision on the policy expressed in the rule.

. Wis.Stat. § 227.11(2)(a), (c) (1994).

facilities do not exist, expire, or are terminated.

. . .

**PSC 132.03 Compensation.** (1)(a) Unless otherwise agreed to by the parties and subject to sub. (2), a public utility which locates its facilities within the right-of-way of a railroad shall compensate the railroad $500 for each crossing. The payment shall be a one-time payment, in lieu of any license fees, to reimburse the railroad for expenses incurred by the railroad as a result of the construction of the facilities and, in the case of a private crossing, to compensate the railroad for the locating of the facilities within the right-of-way.

. . .

(2)(a) In this subsection: . . . 2. "Special circumstances" means unique characteristics of a parcel of property which enhances its value above that of a typical parcel of railroad right-of-way. "Special circumstances" may include the parcel's relationship to other property, the existence of unique topography or natural resources or other unusual characteristics.

(b) A railroad may petition the commission for compensation greater than the amount under sub. (1) if the railroad and the public utility cannot agree on compensation and the railroad incurs extraordinary direct expenses as a result of the construction of the facilities or believes that special circumstances exist. If a petition is filed, the commission shall determine whether extraordinary direct expenses are incurred or whether special circumstances exist and the amount of compensation to be paid to the railroad.

. . .

**PSC 132.04 Casing.** A railroad may not require a gas public utility to encase any steel pipeline facilities installed within the railroad's right-of-way. A gas public utility shall determine whether and how its facilities should be cased and shall comply with all applicable state and federal pipeline safety rules and regulations.

. . .

**PSC 132.06 Notification of construction; emergencies; repair and maintenance.** 1. Unless otherwise agreed to by the par-

ties, a railroad or public utility shall, at its own expense, notify the other of emergencies, planned repair and construction or similar operations within a railroad right-of-way if the operation may affect the other. Except for emergencies, initial notification of intent to construct shall be made not less than 21 days before construction and notification of actual construction shall be made not less than three working days before construction begins.

. . .

**PSC 132.10 Disputes.** (1) Unless otherwise agreed to by the parties:

(a) A railroad may not refuse to permit a public utility to construct facilities within a right-of-way solely because of a dispute between the parties concerning compensation for or conditions to the right of placing the facilities within the railroad right-of-way.

(b) Subject to sub. (2), a public utility may proceed with construction while the dispute is resolved under s. PSC 132.03(2), s. 196.04(4), Stats., or another method mutually selected by the parties. . .

(2) If a public utility constructs facilities within the railroad right-of-way while a dispute is pending and, after notice and hearing, the commission determines that the facilities are located in an unreasonable location or constructed in an unsafe manner, the commission may order the public utility to remove or modify the facilities at the utility's expense.

WIS.ADMIN.CODE § PSC 132 (Jan. 1996).

The railroads filed this lawsuit on February 22, 1996, in the Eastern District of Wisconsin. Count one of the complaint alleges that certain elements of these rules violate the following provisions of the Constitution of the United States: the Contract Clause of Article I, the Takings Clause of the Fifth Amendment, and the Due Process Clause of the Fourteenth Amendment. In count two of the complaint, the railroads invoke the district court's supplemental jurisdiction under 28 U.S.C. § 1367 and allege that the PSC exceeded the scope of its delegated authority under Wisconsin law in crafting the rules. The complaint requests a declaratory judg-

ment and both preliminary and permanent injunctive relief on both counts.

On the same day, the railroads also filed a motion for a preliminary injunction and a temporary restraining order under FED. R.CIV.P. 65(a) and (b), respectively. In their Rule 65 motion, the railroads also alleged that § PSC 132.04 created an imminent threat to public safety by allowing natural gas utilities to install uncased carrier pipe beneath railbeds.

In addition to denying the substance of the railroads' allegations, PSC raised three affirmative defenses in its answer to the complaint. It stated that the district court should dismiss the case for lack of jurisdiction pursuant to the Eleventh Amendment and for improper venue under 28 U.S.C. § 1391. In the alternative, PSC stated that the district court should abstain from deciding the case because the railroads' complaint raises issues implicating vital state regulatory concerns and WIS.STAT. § 227.40 provides for the exclusive avenue of judicial review of any rule promulgated under Wisconsin law. In its brief opposing the railroads' Rule 65 motion, PSC denied that the casing provision of the rules presented any danger to the public and presented evidence in support of its position.

At a hearing conducted on March 7, 1996, in the district court,[2] the railroads indicated that they had already received fourteen notices of intent to place utility facilities in their right-of-ways since the adoption of the rules and that they expected a deluge of similar notices as warmer weather more conducive to installation approached, thereby demonstrating the need for immediate injunctive relief. They also reiterated their concern that the installation of uncased natural gas carrier pipe as contemplated by the rules would create a very real threat to public safety.

The district court issued an order on March 19, 1996, denying the railroads' motion for an injunction. The district court concluded that the railroads had failed to demonstrate any of the several prerequisites to obtaining a preliminary injunction, namely

a likelihood of success on the merits, the potential for irreparable harm absent an injunction, the lack of an adequate remedy at law, and the public interest warranting the issuance of an injunction. The railroads filed this appeal.

## II

### A

Before getting to the merits, we remind all concerned that we are addressing only whether the district court abused its discretion in denying the railroads' motion for an injunction under FED.R.CIV.P. 65. Although this might seem so obvious as undeserving of explicit comment, two factors necessitate its mention. First, as noted where appropriate, there are several points on which our views diverge from those of the district court with respect to the merits of the railroads' case. However, it would be inappropriate to issue precatory discussions on those points, for the railroads' complaint seeking a declaratory judgment and a permanent injunction remains before the district court. Second, there are two lingering issues raised by PSC in its brief opposing the Rule 65 motion that were not fully addressed by the district court.

■ PSC questioned whether the district court may exercise jurisdiction over the railroads' claim for declaratory relief consistent with the dictates of the Eleventh Amendment. The Eleventh Amendment does not bar prospective injunctive relief based upon claims arising under federal law, *see Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 425–26, 88 L.Ed.2d 371 (1985); *Edelman v. Jordan*, 415 U.S. 651, 664–65, 94 S.Ct. 1347, 1356–57, 39 L.Ed.2d 662 (1974); *Ex parte Young*, 209 U.S. 123, 159–60, 28 S.Ct. 441, 454, 52 L.Ed. 714 (1908), and this appeal concerns only the prospective, preliminary relief requested by the railroads. In addition, we note that WIS.STAT. § 196.02(12) states that PSC is amenable to suit and that WIS.STAT. § 227.40 provides for declaratory judgment proceedings against PSC.

---

**2.** Both the railroads and PSC consented in writing to proceed before a magistrate judge of the district court for final determination of the Rule 65 motion pursuant to 28 U.S.C. § 636(c).

PSC also argued that the district court should abstain from deciding the constitutional questions until the State of Wisconsin has had a chance to pass upon the railroads' claims under WIS.STAT. § 227.40. This argument proposes abstention along the lines fashioned in *Railroad Comm'n of Texas v. Pullman,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). The district court refrained from addressing the abstention issue in the context of a Rule 65 motion but did refuse to issue a preliminary injunction solely on the railroads' claims under state law.

Given the district court's approach to this issue (i.e., its abstention from determining whether to abstain), we are not in a position to make a determination whether abstention is appropriate in reviewing the district court's denial of the railroads' Rule 65 motion. The doctrines of abstention mentioned above accommodate the strong federalism interest in allowing a state first crack at interpreting its own laws and thereby potentially avoiding the need for an article III court to invalidate a state law based upon a conflict with the federal Constitution.

This appeal does not require that we fully determine whether the rules promulgated by PSC impair constitutionally protected interests or whether PSC exceeded its lawful authority under Wisconsin state law in producing the rules. It may be true, as the district court recognized, that resolution of the latter question by a state court would obviate the need to visit the former. However, our job is to determine whether the merits of the railroads' case and the scope of portended harm warrant injunctive relief. We believe that the decisional matrix involved in a decision regarding abstention in this case requires that the question be subject to ventilation and an informed initial determination in the district court.

## B

■ In order to obtain a preliminary injunction, the moving party must demonstrate (1) some likelihood that it will prevail on the merits of its claim, (2) absence of an adequate remedy at law, and (3) that it will suffer irreparable harm absent injunctive relief. *Erickson v. Trinity Theatre, Inc.,* 13 F.3d 1061, 1067 (7th Cir.1994); *Atari, Inc. v. North American Philips Consumer Electronics Corp.,* 672 F.2d 607, 613 (7th Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982). Should the movant satisfy these requirements, the district court must then weigh the portended irreparable harm to the movant against the potential injury to the enjoined party and must consider the effect of the injunction upon nonparties, including the public at large. *Erickson,* 13 F.3d at 1067; *Abbott Lab. v. Mead Johnson & Co.,* 971 F.2d 6, 12 (7th Cir.1992). A determination whether to issue a preliminary injunction is, by its very nature, an exercise in weighing competing equities and interests. *See Roland Mach. Co. v. Dresser Indus.,* 749 F.2d 380 (7th Cir.1984).

■ Just as there is no formulaic standard for deciding whether to issue an injunction, there is not a rigid calculus guiding appellate review. "Normally, our review of the district court's determination is tailored to the various functions that the district court performs in evaluating whether to grant or deny a preliminary injunction." *In re L & S Indus., Inc.,* 989 F.2d 929, 932 (7th Cir.1993). We must accept the district court's findings of fact unless clearly erroneous, id., and will give substantial deference to the district court's "discretionary acts of weighing evidence or balancing equitable factors." *United States v. Baxter Healthcare Corp.,* 901 F.2d 1401, 1407 (7th Cir.1990). However, we reserve plenary review for the district court's conclusions of law. *Id.*

## III

The railroads asserted three constitutional grounds for injunctive relief, and the district court held that the railroads had not demonstrated a probability of success on the merits of their constitutional claims sufficient to warrant the issuance of an injunction. It concluded in a brief paragraph that the railroads also had failed to demonstrate irreparable harm. While we disagree with certain portions of the district court's analysis of the merits of the railroads' case, we find that the

railroads did not demonstrate the potential for irreparable harm or the absence of an adequate remedy at law, both of which are necessary to obtain an injunction.

### A

The Takings Clause reads: "[N]or shall private property be taken for public use, without just compensation." U.S. CONST. amend. V. The railroads claim that the rules promulgated by PSC violate the public use and just compensation components of the Takings Clause, which is applicable to the several States through the Fourteenth Amendment. *Chicago, Burlington & Quincy R.R. Co. v. City of Chicago,* 166 U.S. 226, 235–41, 17 S.Ct. 581, 584–85, 41 L.Ed. 979 (1897).

The railroads argue that the rules violate the public use requirement because they do not require PSC to make a case-by-case determination of public use for the installation of each transmission facility. They also argue that the presumptive compensation of $500 per facility, which is fixed by the rules absent special circumstances, is inconsistent with the just compensation requirement because it is the product of a legislative—as opposed to a judicial—determination.

■ By authorizing the installation of utility transmission facilities, the rules clearly allow for the taking of private property. *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 438–40, 102 S.Ct. 3164, 3177–79, 73 L.Ed.2d 868 (1982); *Western Union Tel. Co. v. Pennsylvania R.R. Co.,* 195 U.S. 540, 570–72, 25 S.Ct. 133, 141–42, 49 L.Ed. 312 (1904); *City of St. Louis v. Western Union Tel. Co.,* 148 U.S. 92, 98–100, 13 S.Ct. 485, 488, 37 L.Ed. 380 (1893). This physical invasion triggers the requirements that the taking be for a public use and that just compensation be paid to the property owner.

■ The initial determinations of whether a taking is in furtherance of, and tailored to, a public use are the province of the legislature. *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 239–40, 104 S.Ct. 2321, 2328–29, 81 L.Ed.2d 186 (1984). There is a well-founded tradition of deference by the courts to such legislative determinations. *See, e.g., Berman v. Parker,* 348 U.S. 26, 31–33, 75 S.Ct. 98, 101–02, 99 L.Ed. 27 (1954); *Old Dominion Land Co. v. United States,* 269 U.S. 55, 66, 46 S.Ct. 39, 40, 70 L.Ed. 162 (1925). We will not substitute our judgment for that of the state legislature "unless the use be palpably without reasonable foundation." *United States v. Gettysburg Elec. Ry. Co.,* 160 U.S. 668, 680, 16 S.Ct. 427, 429, 40 L.Ed. 576 (1896).

■ The railroads have not demonstrated that the rules violate the public use requirement and have therefore failed to show any harm (much less any irreparable harm), nor have they demonstrated the inadequacy of their remedies at law. They characterize the rules as essentially delegating to the utilities the authority to determine whether an installation comports with the public use requirement.

We agree that the rules do not require PSC to determine individually whether each installation is for the public use, but it is clear that the Wisconsin legislature and PSC have determined generally that such installations will benefit the public. *See* WIS.STAT. § 196.04(4) (requiring that PSC determine that "public convenience and necessity" justify the installation of utility transmission facilities); WIS.STAT. § 227.11(2)(a) (empowering PSC to make rules interpreting § 196.04(4) if necessary "to effectuate the purpose of the statute").

The Wisconsin legislature delegated to PSC the authority to write rules concerning the installation of utility transmission facilities for the benefit of the public, and this delegation poses no constitutional infirmities. PSC attempts to argue that the rules do not foreclose the railroads from seeking administrative and judicial review of a public use question because they make no mention of the public use requirement.

We agree with the railroads that this argument is untenable. However, the railroads may avail themselves of state administrative and judicial review of any proposed installation based upon the public use requirement. *See* WIS.STAT. §§ 227.41–.42.

The railroads offer two examples of the nonpublic character of the uses for the takings authorized by the rules. In the first case, a telecommunications provider installs a fiber-optic transmission facility for the purpose of competing with AT & T. This causes us no concern, for increased competition in the telecommunications market clearly serves the public interest, as aptly illustrated by the recent enactment of the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56.

In the second example, an electric utility provided notice of its intention to install fiber optic cable to enhance its own internal communications network. The railroads have not identified the precise nature of the use for this communications system, and it may well be to provide faster and more reliable communications in times of emergency, which benefits the consuming public. But we may safely assume that, at a minimum, this involves a utility's effort to increase its efficiency, and any effort to deliver electricity for less money clearly benefits consumers.

■ A comment is due the district court's use of our discussion of the public use requirement in *Gamble v. Eau Claire County*, 5 F.3d 285, 287 (7th Cir.1993), *cert. denied*, 510 U.S. 1129, 114 S.Ct. 1096, 127 L.Ed.2d 410 (1994). The fact that the public use component of the Takings Clause may infrequently be the tool by which takings are invalidated does not convert this important constitutional provision to a dead letter. In fact, we agree with a noted commentator that such minimalization of the public use requirement is inconsistent with the tenets of political theory underlying this constitutional limitation upon the state's power of eminent domain. *See* RICHARD A. EPSTEIN, TAKINGS— PRIVATE PROPERTY AND THE POWER OF EMINENT DOMAIN 161–81 (1985). In this case, however, the taking is "rationally related to a conceivable public purpose." *National R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 422, 112 S.Ct. 1394, 1404, 118 L.Ed.2d 52 (1992).

■ When the state effects a taking of private property for public use, the Takings Clause requires that the person deprived of that property be paid just compensation.

The just compensation requirement of the Takings Clause places takings in a class by themselves because, unlike other constitutional deprivations, the Takings Clause provides both the cause of action and the remedy. *See First English Evangelical Lutheran Church v. Los Angeles County*, 482 U.S. 304, 316 & n. 9, 107 S.Ct. 2378, 2386 & n. 9, 96 L.Ed.2d 250 (1987). The question of just compensation asks "what has the owner lost, not what has the taker gained." *Boston Chamber of Commerce v. Boston*, 217 U.S. 189, 195, 30 S.Ct. 459, 460, 54 L.Ed. 725 (1910). The pecuniary value of the loss is usually gauged by the extent to which the taking deprived the owner of his ownership or dominion interest in his property, measured by the value of the property at the time of the taking. *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 5, 104 S.Ct. 2187, 2191, 81 L.Ed.2d 1 (1984).

■ In takings cases involving a physical invasion (such as the present case), the plaintiff must exhaust available state judicial remedies for just compensation as a prerequisite to a lawsuit in an article III court. *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186–94, 105 S.Ct. 3108, 3116–20, 87 L.Ed.2d 126 (1985). However, *Williamson County* requires exhaustion only if the state has provided "an adequate process for obtaining compensation." *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 882 F.2d 1398, 1402 (9th Cir. 1989) (citing *Williamson County*, 473 U.S. at 194, 105 S.Ct. at 3121), *cert. denied*, 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990). As we wrote in *Gamble*:

> [S]ince the right protected by the duty of just compensation is not to the land or its use but merely to the market value of what is taken, the landowner cannot complain that his constitutional right has been denied until he exhausts his remedies for obtaining a compensation award or equivalent relief from the state.... Until then he cannot know whether he has suffered the only type of harm for which the just compensation provision of the Constitution entitles him to a remedy.

5 F.3d at 286; *see also Estate of Himelstein v. City of Fort Wayne,* 898 F.2d 573, 576 (7th Cir.1990).

The rules at issue allow a railroad to petition PSC for just compensation greater than the $500 established by the rules if the railroad thinks that the measure of its loss caused by the facility installation exceeds that amount. And PSC's resolution of this petition is subject to judicial review. *See* WIS.STAT. § 227.52.

■ The railroads have not demonstrated that they will suffer irreparable harm because they have failed to show that the procedures Wisconsin has provided for seeking just compensation are inadequate. Indeed, they have failed to avail themselves of those procedures.

■ The railroads argue that the rules violate the just compensation requirement because PSC exercised its delegated legislative authority in determining just compensation. The railroads are quite correct that a decision concerning the just compensation owed one whose property is taken is the province of judicial—not legislative—determination. *Monongahela Navigation Co. v. United States,* 148 U.S. 312, 327, 13 S.Ct. 622, 626–27, 37 L.Ed. 463 (1893); *Charles River Bridge v. Warren Bridge,* 36 U.S. (11 Pet.) 420, 571, 9 L.Ed. 773 (1837). However, as *Williamson County* illustrates, this requirement is satisfied by the availability of judicial review. The Fifth Amendment does not require a judicial determination of just compensation in the first instance on each occasion of a taking of private property.

■ Nor does the Fifth Amendment require that the compensation be paid prior to, or contemporaneously with, the taking; it requires only that there exist a "reasonable, certain and adequate provision for obtaining compensation." *Williamson County,* 473 U.S. at 194, 105 S.Ct. at 3120 (citations omitted). The railroads have not shown the challenged procedures to be inadequate.

■ This discussion raises an ancillary issue concerning the propriety of issuing an injunction based upon a violation of the just compensation component of the Takings Clause. The Takings Clause protects private property interests but it does not render them inviolable, for if it did then the just compensation requirement would have no place in the Fifth Amendment. A state is required to pay just compensation when it exercises its power of eminent domain, and in most cases (as in this one), this just compensation will take the form of money to compensate a property owner for a physical invasion. With the question being one of monetary compensation, a plaintiff would be hard pressed to demonstrate either irreparable harm or an inadequate remedy at law. *Cf. Harper v. Virginia Dep't of Taxation,* 509 U.S. 86, 100–02, 113 S.Ct. 2510, 2519–20, 125 L.Ed.2d 74 (1993); *McKesson Corp. v. Division of Alcoholic Beverages and Tobacco,* 496 U.S. 18, 36–37, 110 S.Ct. 2238, 2250–51, 110 L.Ed.2d 17 (1990); *Preseault v. ICC,* 494 U.S. 1, 11–12, 110 S.Ct. 914, 921–22, 108 L.Ed.2d 1 (1990); *Williamson County,* 473 U.S. at 194–97, 105 S.Ct. at 3120–22; *Railway Labor Executives Ass'n v. Gibbons,* 448 U.S. 1301, 1304, 100 S.Ct. 2668, 2671, 65 L.Ed.2d 1094 (1980).

The exhaustion requirement identified in *Williamson County* bears this out, for a plaintiff can claim a harm worthy of scrutiny by an article III court only if that harm is not redressable through the mechanism of a state's procedures of administrative and judicial review.

In the context of the just compensation requirement of the Takings Clause, the harm is the denial of just compensation. However, a plaintiff who has available avenues of state judicial review cannot claim a harm until it has been denied just compensation. We fail to see how the railroads can claim irreparable harm where they have failed to perfect their available remedies under state law.

**B**

■ The railroads' second constitutional challenge is that the rules contravene the Due Process Clause of the Fourteenth Amendment by committing to PSC the determination of just compensation, thereby depriving them of property "without due process of law." U.S. CONST. amend. XIV. They argue that the rules' provision for addi-

tional compensation for "special circumstances" does not take into account the disparity between the values of parcels of land along a railroad right-of-way. They also claim that judicial review of the administrative determination is insufficient because the court is limited to the record before PSC and will defer to PSC's determination of just compensation—as a finding of fact—if it is supported by substantial evidence.

The railroads cite to *Bragg v. Weaver*, 251 U.S. 57, 60–61, 40 S.Ct. 62, 64, 64 L.Ed. 135 (1919), and offer a parenthetical explanation of that decision that is instructive: "due process requires that an owner 'may obtain a full hearing in a court of justice ... before the compensation is finally determined.'" We agree with the railroads that a final determination of just compensation is a judicial function—as discussed above—and that the denial of judicial review would pose constitutional difficulties. However, nothing in *Bragg* suggests that the initial determination must also be made by a judicial body. In fact, the procedure challenged in that case provided for initial compensation determination by a board of supervisors, with that determination subject to *de novo* judicial review. 251 U.S. at 60, 40 S.Ct. at 64.

The railroads use this aspect of *Bragg* to suggest that the rules at issue here do not provide due process because any judicial review of a decision by PSC will entail deference to findings of fact such as just compensation. This argument has some merit, and we do not share the district court's conclusion that judicial review by Wisconsin state courts would suffice under the rule of decision in *Bragg*. However, because the portended harm is redressable through monetary compensation, the railroads again fail to demonstrate that they will suffer irreparable harm or that they lack an adequate remedy at law.

### C

The third basis for the railroads' constitutional assault on the rules is the Contract Clause of Article I. It reads: "No State shall ... pass any ... Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. The Contract Clause was originally written to prevent the states from enacting debtor relief laws, and the Supreme Court has relied upon the Contract Clause mainly to limit the ability of states to modify public charters and contracts to which a state is a party. *See, e.g., United States Trust Co. v. New Jersey*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977); *Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819).

Although the original goal of the Contract Clause—the prevention of state debtor relief laws—and the plain meaning of its text suggest a limit on the states' ability to alter private contracts, this application of the clause has never gained real momentum.

With the advent of the twentieth century, the emerging doctrine known as "substantive" due process became the Supreme Court's favored mechanism for invalidating state legislation that impaired private economic relationships. *See, e.g., Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905). And the Court wrote that "literalism in the construction of the contract clause ... would make it destructive of the public interest by depriving the State of its prerogative of self-protection." *W.B. Worthen Co. v. Thomas*, 292 U.S. 426, 433, 54 S.Ct. 816, 818, 78 L.Ed. 1344 (1934).

However, two recent decisions manifest the Supreme Court's willingness to look again to the original intent of the clause: *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), and *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983). The following excerpt from *Spannaus* manifests the renewed vigor with which the Court was prepared to interpret and apply the clause to state impairment of private contractual relationships:

> The severity of an impairment of contractual obligations can be measured by the factors that reflect the high value the Framers placed on the protection of private contracts. Contracts enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights

and obligations are binding under the law, and the parties are entitled to rely on them.

*Spannaus,* 438 U.S. at 245, 98 S.Ct. at 2723.

■ The Court's examination of the challenged state laws in these two cases manifests a three-step analytical approach. A reviewing court should first examine the extent to which the challenged state law works an impairment of contract. If there is an impairment, it must be justified by a significant and legitimate public purpose. If such a purpose exists, then the court must ask whether the adjustments of the rights and/or responsibilities of the contracting parties are appropriate to the public purpose and based upon reasonable conditions. *Kansas Power & Light,* 459 U.S. at 411–13, 103 S.Ct. at 704–05.

■ The impairment inquiry is case-specific and dictates the extent of further inquiry.

The severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation.

*Spannaus,* 438 U.S. at 245, 98 S.Ct. at 2723. In determining the scope of the impairment, the reviewing court must weigh the extent of previous state regulation of the particular field of commerce. *Kansas Power & Light,* 459 U.S. at 411, 103 S.Ct. at 704. The law need not eviscerate contractual rights or responsibilities to amount to an impairment, but it must do more than restrict the parties to the benefits and burdens created by the contract. *Id.*

■ The railroads have failed to demonstrate how the rules work an impairment of existing contractual relationships between the railroads and the utilities. The railroads argue that the rules allow a utility to terminate its contract with a railroad yet keep a transmission facility in place, thereby precluding the railroad's remedies for breach of contract. However, this is a somewhat con-voluted interpretation of the rules seemingly crafted to raise a constitutional question.

The rules specifically exclude present transmission facilities from coverage unless the "agreements concerning existing facilities do not exist, expire, or are terminated." WIS.ADMIN. CODE § PSC 132.01(2). Once those agreements terminate, for whatever reason, the rules may indeed allow the utility to keep the facility in place in accordance with the relevant rules. However, the rules do not preclude or even address a railroad's remedies if the termination is in any way a breach of the utility's obligations under the contract.

Even if we were to find an impairment, its minimal character would easily be justified by its broad applicability in furtherance of a legitimate public interest. A law imposing "a generally applicable rule of conduct designed to advance 'a broad societal interest'" will typically fare better in scrutiny under the Contract Clause than a law that strictly addresses contractual obligations or remedies. *Exxon Corp. v. Eagerton,* 462 U.S. 176, 191, 103 S.Ct. 2296, 2306, 76 L.Ed.2d 497 (1983) (quoting *Spannaus,* 438 U.S. at 249, 98 S.Ct. at 2724).

### IV

The railroads have suggested only two types of irreparable harm that they believe they will suffer absent an injunction. First, they claim that allowing the installation of a transmission facility to precede a determination of public use by PSC is precisely the sort of temporary deprivation of constitutional rights that we found to warrant injunctive relief in *National People's Action v. Village of Wilmette,* 914 F.2d 1008, 1013 (7th Cir. 1990), *cert. denied,* 499 U.S. 921, 111 S.Ct. 1311, 113 L.Ed.2d 245 (1991). Second, they raise the question of whether the rules allow a railroad to prevent any installation that may be unsafe or may offer the potential to interfere with railroad operations. The sole remedy, they argue, is an *ex post* petition to PSC, but even in a case where PSC may agree with the railroad, the rules do not allow the railroad to recover any costs associated with the aborted or removed installation.

### A

As is clear from our discussion in part III, the only colorable argument of constitutional deprivation offered by the railroads concerns the mechanism for providing just compensation under the requirements of the Fifth and Fourteenth Amendments. We drew no conclusions about the likelihood of the railroads' eventual success on the merits of their claims, for we found that the lack of irreparable harm foreclosed entry of an injunction. It is worth noting that the railroads cite to *National People's Action* in support of their argument, for in that case we found that the moving party had demonstrated a likelihood of success on the merits but had failed to demonstrate any irreparable harm. 914 F.2d at 1012–13.

That holding is fully consistent with our decision today, for we can divine no irreparable harm that will be suffered by the railroads absent an injunction. In addition, the temporary deprivation involved in *National People's Action* was of the First Amendment variety and did not involve the property interests at issue in the present case. The railroads claim that it is the rules' abrogation of the public use requirement that portends irreparable harm. Yet unlike the interest at stake in *National People's Action,* the railroads have not demonstrated a likelihood of success on the merits of their public use argument.

We have found merit in the railroads' challenges to the compensation system fixed by the rules. Yet the only question presented in a just compensation inquiry is whether adequate procedures exist and whether those procedures provide the property owner with the accurate measure of his loss. In this case (as in most takings cases), the compensation is pecuniary and the entity responsible for the compensation is the state.

We doubt very much that the State of Wisconsin will become insolvent prior to a determination of the railroads' suit for declaratory judgment, and it is upon the resolution of that proceeding that the railroads may act to recover whatever losses they may be deemed to have suffered. This basic fact, when combined with our assessment of the public use involved in this case and the defer-ence we traditionally accord state legislatures on that issue, leads us to conclude that with respect to the constitutional issues, this is not a case of potential irreparable harm warranting injunctive relief.

### B

We would add, however, that the public safety issue is a bit more nettlesome. The district court briefly evidenced its satisfaction that the utilities were required to comply with all applicable state and federal safety regulations, yet we find no evidence in the record showing that those regulations adequately address the safety concerns cited by the railroads.

Furthermore, evidence presented to the district court suggests that safety concerns dictate that gas pipelines either be encased or meet certain specifications for thickness and depth of burial. PSC did offer evidence controverting the efficacy of casing and demonstrating alternative approaches, including deeper burial and thicker carrier pipe. But nothing in the record demonstrates that compliance with state and federal regulations would satisfy PSC's alternative safety requirements.

PSC offered the testimony of PSC engineer Thomas Stemrich, who testified about the deleterious effects of casing upon the cathodic protection against pipeline corrosion. Mr. Stemrich testified that encasing steel carrier pipes shields those pipes from the cathodic protection, which is the impression of low DC voltage upon the pipe to retard corrosion. Mr. Stemrich concluded that because the casing of a pipe requires ventilation to the atmosphere, the resulting atmospheric corrosion could lead to a breach of the carrier pipe. He opined that the better safety option was to increase the thickness of the carrier pipe and to bury these pipes deeper beneath the railbed.

Mr. Stemrich based his testimony on a technical paper entitled FINAL REPORT—TECHNICAL SUMMARY AND DATABASE FOR GUIDELINES FOR PIPELINES CROSSING RAILROADS AND HIGHWAYS, which was prepared for the Gas Research Institute by the School of Civil and Environmental Engineering at Cor-

nell University in December 1991. This report, which PSC introduced into the record, examined the effect of both internal and external loads upon uncased carrier pipe buried underground. The external loads comprise the dead load of earth forces and the live load of train and highway traffic. The earth load is applied to the pipe along four ninety-degree arcs centered on the pipe crown, the two springlines, and the support bedding. The live load is applied primarily along the ninety-degree arcs at the crown and the invert, and the study assumed voids along the springlines. The study employed "a comprehensive design methodology which accounts for three-dimensional soil-pipeline interaction, three-dimensional pipeline stresses, and the effects of repeated loadings and fatigue."

We need not delve any further into the technical intricacies or scientific methodology of the Cornell report. It is clear that this study purports to make great advances in the load dynamics of uncased carrier pipe design and employs a scientific method that accommodates a greater number of forces acting upon the carrier pipe than previous work in this area. In its conclusion, the report states:

> The research has demonstrated that pipelines can be designed to withstand railroad and highway loading without the need of casings. Specific design procedures have been developed to calculate the wall thickness and depth of burial required to reduce stresses to within allowable limits. These design procedures were developed using three-dimensional computer analyses, which have given the first comprehensive view of pipeline stresses in uncased crossings, and furnish the basis for providing the gas industry with a means for alternative pipeline design and construction practice.

FINAL REPORT, *supra*, at viii.

The study also made several findings concerning the effect of casing upon carrier pipe corrosion, including the following:

> Because air circulates through the vent pipes and within the annular space between the carrier and casing, the carrier may be exposed to atmospheric corrosion. This type of corrosion usually is the result of an alternate wetting and drying process, with corrosion occurring when a metallic surface is wet. Conditions within the casing are well-suited for condensing moisture on the carrier surface. If the presence of moisture coincides with the location of a tear or penetration of the protective coating, then corrosion can occur.

> A casing may interfere with the cathodic protection system by affecting the way impressed current flows to or within the carrier pipe.... If the carrier is truly insulated from the casing, ... then the casing will shield the carrier from the impressed current. Moisture, however, still can condense on the carrier surface. If a local accumulation of moisture promotes a corrosion cell at a breach in the protective coating, there will be no cathodic protection supplied as a result of the impressed current. Accordingly, the effects of atmospheric corrosion may remain unchecked until local thinning of the pipe wall leads to a safety problem.

FINAL REPORT, *supra*, at 165.

Evidence supporting both sides of this issue was presented during the rule-making proceedings and before the district court.

Mr. Stemrich testified that it was his understanding that the guidelines for carrier pipe thickness and burial depth proposed by the Cornell study had been implemented by the American Railway Engineering Association. While there was no explicit testimony to this effect, it is reasonable to conclude that PSC has also adopted the findings of the Cornell study. In fact, PSC states in its brief that the study "was part of the PSC's basis for adopting s. PSC 132.04, Wis.Adm. Code." The district court concluded that the evidence did not support a finding of irreparable harm.

In reaching this determination, the district court drew its own conclusion concerning the parties' competing views of the casing issue and the evidence they presented in support of their arguments. This is precisely the sort of fact-specific determination on which we defer to a district court in reviewing decisions on motions under FED.R.CIV.P. 65. In these appeals, "our review is limited

to determining 'whether the judge exceeded the bounds of permissible choice in the circumstances, not what we would have done if we had been in his shoes.'" *Thornton v. Barnes,* 890 F.2d 1380, 1385 (7th Cir.1989) (quoting *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1084 (7th Cir.1988)).

■ It is our view that PSC presented compelling evidence that the approach suggested by the Cornell study is an improvement over the method of encasing carrier pipes. Furthermore, the railroad did not submit any evidence suggesting that the gas utilities would not employ that approach when installing gas transmission carrier pipe facilities beneath railbeds. In any case, the district court made a permissible choice in the face of conflicting evidence, and we decline to reverse that decision.

The railroads have not made their case for the issuance of an injunction on their claims for relief under federal law; accordingly, we will not address their supplemental state law claims. An injunction is extraordinary relief warranted by extraordinary circumstances, and because this case lacks such circumstances, the decision of the district court is

AFFIRMED.